# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00737-CV

### BMC West Corporation a/k/a BMC West, LLC and Julian Noe Silva, Appellants

### v.

### Martha Karlson, as Independent Administrator of the Estate of Joyce Angela Williams, Deceased, Appellee

---

### FROM PROBATE COURT NO. 1 OF TRAVIS COUNTY
### NO. C-1-PB-19-001339, THE HONORABLE GUY S. HERMAN, JUDGE PRESIDING

---

## O P I N I O N

BMC West Corporation and Julian Noe Silva both appeal a judgment rendered on a jury verdict awarding damages against them in favor of Martha Karlson in her capacity as the independent administrator of the Estate of Joyce Angela Williams. The judgment awards against Silva actual damages, and against BMC both actual and exemplary damages, arising out of injuries that Williams sustained in a car wreck caused by Silva's running his BMC truck into the back of a car that Williams was riding in and that was being driven by her friend, Mary Hartsell.[1] At trial, the defendants conceded Silva's negligence in causing the wreck, and BMC accepted *respondeat superior* liability for Silva's negligence. But beyond these claims, Karlson also sought judgment

---

[1] Because this suit was commenced before the relevant effective date, this suit is not subject to subchapter B of Civil Practice and Remedies Code chapter 72. *See* Act of May 28, 2021, 87th Leg., R.S., ch. 785, §§ 1–7, secs. 72.051–.055, 2021 Tex. Gen. Laws 1855, 1855–60 (amended 2023).

in her favor on direct-negligence allegations against BMC and on requests for exemplary damages against each defendant. The jury returned a verdict finding each of BMC and Silva directly negligent, apportioning their responsibility, assessing amounts in actual damages for physical pain and separately for mental anguish, finding BMC liable for gross negligence, assessing exemplary damages against BMC, and refusing to find Silva liable for gross negligence or to assess exemplary damages against him.

In five appellate issues, BMC and Silva contend that judgment should be rendered in their favor for various reasons on the direct-negligence allegations against BMC, that BMC is not liable in exemplary damages, that judgment should be rendered in their favor on the request for mental-anguish damages, that any of numerous other alleged errors merits remand for a new trial, and that the trial court failed to appropriately apply the relevant exemplary-damages cap.

We conclude that Karlson must take nothing on the direct-negligence allegations against BMC. We also conclude that neither of Karlson's two predicates for holding BMC liable in exemplary damages is viable any longer. We reject BMC and Silva's request for rendition of judgment in their favor on Karlson's request for mental-anguish damages. But we conclude that the trial court abused its discretion in selecting the remedies that it did for BMC and Silva's purported spoliation conduct—a spoliation instruction to the jury coupled with admissions of spoliation-related evidence before the jury. As a result, we affirm portions of the trial court's judgment but reverse the rest of it, rendering judgment that Karlson take nothing on the direct-negligence allegations against BMC and on the request for exemplary damages against BMC and remanding for a new trial consistent with this opinion.

2

## BACKGROUND

In early January 2019, Hartsell was driving herself and Williams along a farm-to-market road in western Travis County. The road at that point had two westbound lanes, and Hartsell and Williams were traveling in the left of those two lanes. Hartsell applied her brakes, her brake lights illuminated, she activated her left-turn signal, the signal's back light illuminated, and she slowed and eventually stopped her car so that she could make a left turn.

In the same lane behind Hartsell and Williams, Silva was driving a BMC truck while in the course and scope of his employment with BMC. Evidence at trial suggested that he continued traveling in the left westbound lane for about eleven seconds while Hartsell's left-turn-signal light was illuminated and visible from the perspective of a driver of Silva's BMC truck. Evidence also suggested that while Hartsell's car was stopped in the left lane, Silva, rather than slowing the truck to stop, pressed the accelerator. Only about one second before colliding with Hartsell's car, evidence showed, did Silva's truck begin braking. He attempted a literal last-second right-turn maneuver, but it was too late. The truck struck Hartsell's car, collapsing its back half. As a result of the collision, Williams suffered multiple displacement fractures to several of her ribs. She was transported to the hospital. Both BMC and Silva admit that Silva was negligent in causing the wreck, and Karlson adduced evidence to try to show that Silva caused the wreck for either or both of the reasons that he was speeding and that he was inattentive while driving, including because he was operating one of the two cellphones with him—one a BMC-issued phone and the other his personal cellphone.

Williams was treated in the hospital for about 13 days before she died. Much of her treatment involved both pain management and attempts to ensure that she was getting enough oxygen. One of the methods of supplying oxygen was the administration of a mask-like device to

3

increase the pressure of air delivered to her lungs. Although healthcare providers intended for Williams to be weaned off the use of the device so that she could soon return home, she was found unresponsive one day with the mask off her face. She died from acute hypoxic respiratory failure.

Karlson was one of Williams's close friends and became the administrator of Williams's estate. In that capacity, she filed this suit, alleging that Silva negligently caused the wreck, that BMC was liable for Silva's negligence under *respondeat superior*, and that Williams suffered compensable physical pain and mental anguish before her death.[2] Karlson also pleaded direct-negligence allegations against BMC—that it had proximately caused Williams's damages by negligent hiring, negligent entrustment, negligent training, negligent supervision, negligent retention, and negligence by lacking an adequate safety policy and program for all its drivers. She sought actual damages from BMC for this alleged direct liability. She also sought exemplary damages from both BMC and Silva, asserting that BMC was liable in exemplary damages either for its own direct gross negligence or for Silva's. Before trial began, Karlson moved that the trial court give the jury a spoliation instruction in the jury charge, arguing that BMC and Silva had, with the requisite intent, failed to preserve and produce certain telematics data regarding the truck that Silva was driving at the time of the wreck, certain data from the two cellphones, and certain driver logs regarding Silva's driving activity.

At trial, BMC and Silva conceded that Silva's direct negligence caused the wreck, and BMC accepted *respondeat superior* liability for his negligence. Karlson in her examination of many of the fact and expert witnesses, and in her opening and closing arguments, referred to

---

[2] Williams's personal causes of action for personal injury survived to be prosecuted by her estate's administrator under Civil Practice and Remedies Code section 71.021.

4

BMC and Silva's purported spoliation conduct. By the time of trial, the trial court had granted her motion for the spoliation instruction, and the instruction was ultimately given to the jury.

The jury returned its verdict on the following six questions. In Question No. 1, it found that negligence by BMC and that negligence by Silva each proximately caused Williams's injuries in the wreck. In Question No. 2, it assessed that BMC was 67% responsible for the wreck and that Silva was 33% responsible for it. In Question No. 3, the jury assessed $9 million for Williams's physical pain and $10 million for her mental anguish, each arising out of the days from the wreck to her death, inclusively. In Question No. 4, the jury found that the harm to Williams resulted from BMC's gross negligence, but it did not answer whether the harm resulted from gross negligence by Silva.[3] In Question No. 5, the jury assessed $70 million in exemplary damages against BMC. In Question No. 6, it did not assess any exemplary damages against Silva—the jury did not answer the question.

Karlson moved for, and the trial court rendered, judgment on the verdict.[4] It rendered judgment awarding against BMC actual and exemplary damages, pre- and postjudgment interest, and costs. The judgment also awarded against Silva a proportionally reduced amount in actual damages and costs and awarded against him pre- and postjudgment interest. The judgment specified that BMC was jointly and severally liable for the entire judgment. After postjudgment-motion practice, BMC and Silva now appeal.

---

[3] The charge instructed the jury not to answer this question for a given party if the jury was not unanimous in answering "Yes" as to that party and did not achieve a vote of ten or more jurors to answer "No" as to that party.

[4] The trial court also granted BMC's motion for a directed verdict on the allegation of negligent hiring, and Karlson does not challenge that ruling on appeal.

## DISCUSSION

### *BMC is entitled to rendition of judgment that Karlson take nothing on her direct-negligence allegations against it.*

BMC's first appellate issue concerns Karlson's allegations of direct negligence against it, as distinct from the allegations of negligence against Silva, the latter for which BMC accepts *respondeat superior* liability.[5] *See, e.g.*, *Werner Enters. v. Blake*, 719 S.W.3d 525, 540 (Tex. 2025) (distinguishing "claims for negligent training and supervision" from "an employer's usual respondeat superior liability" and observing: "We have not recognized negligent training or supervision as an independent theory of tort liability. But with respect to the analogous allegation of negligent hiring, we have determined that any such claim 'requires negligence by two separate parties: the employer's negligence in hiring the employee and the employee's subsequent negligent act or omission. Both negligent acts must proximately cause the injury." (quoting *Endeavor Energy Res., L.P. v. Cuevas*, 593 S.W.3d 307, 311 (Tex. 2019))). Karlson alleged against BMC negligent hiring, negligent entrustment, negligent training, negligent supervision, negligent retention, and negligence by lacking an adequate safety policy and program for all its drivers.[6] The trial court granted a directed verdict for BMC on the allegation of negligent hiring, and Karlson does not challenge that ruling on appeal.

BMC under this appellate issue offers several distinct arguments for reversal of the judgment against it as concerns its liability for the direct-negligence allegations. Many of the distinct arguments would, if meritorious, support rendition of judgment that Karlson take nothing

---

[5] Silva joins in this first appellate issue, but because it addresses only BMC's liability, we discuss the issue only in terms of BMC.

[6] Karlson also alleged what she termed negligent monitoring, but on appeal, both sides treat this allegation as if it is subsumed within one or more of the other direct-negligence allegations. We will do the same.

on one or more of the direct-negligence allegations, and the rest would, if meritorious, support remand for a new trial. We begin with the rendition arguments. *See Bradleys' Elec. Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (per curiam).

*Karlson waived any recovery for negligent entrustment by failing either to secure jury findings on all the allegation's elements or to adduce conclusive evidence on all elements.*

The first rendition argument is that Karlson failed to carry her burden for negligent entrustment by failing either to secure the necessary jury findings or to adduce conclusive evidence on every element of the allegation. *See Energy Transfer Partners, L.P. v. Enterprise Prods. Partners, L.P.*, 593 S.W.3d 732, 741 & n.36 (Tex. 2020) (plaintiff's burden); *Discovery Prop. & Cas. Ins. Co. v. Tate*, 298 S.W.3d 249, 257 (Tex. App.—San Antonio 2009, pet. denied) (same). The elements of negligent entrustment as relevant here are that (1) the owner entrusted the automobile (2) to a person who was an unlicensed, incompetent, or reckless driver (3) and who the owner knew or should have known was unlicensed, incompetent, or reckless; (4) the driver was negligent; and (5) the driver's negligence proximately caused the accident and the plaintiff's injuries. *See Robson v. Gilbreath*, 267 S.W.3d 401, 405 (Tex. App.—Austin 2008, pet. denied).

BMC at the charge conference objected that Question No. 1 failed to submit negligent entrustment because the question did not submit all the allegation's elements. Karlson did not object to Question No. 1 on any such basis, arguing instead that the court should submit the question as it ultimately appeared in the charge. As submitted, Question No. 1 asks whether the negligence, if any, of BMC or Silva proximately caused the occurrence in question and instructs on the meanings of "negligence," "ordinary care," and "proximate cause." The question and its instructions comport with the elements of a claim for general negligence—a legal duty, a breach of that duty, and damages proximately resulting from the breach. *See Elephant Ins. Co. v.*

7

*Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022). However, whether by instruction, by special issue, or in any other way, Question No. 1 does not mention either the second or the third element of negligent entrustment—that the driver was unlicensed, incompetent, or reckless and that the vehicle owner knew or should have known that the driver was unlicensed, incompetent, or reckless.

Because Question No. 1 does not submit every element of a negligent-entrustment allegation, it does not submit negligent entrustment, and Karlson thus failed to secure jury findings on every element of the allegation.[7] *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992); *Stripling v. McKinley*, 746 S.W.2d 502, 506 (Tex. App.—Dallas 1988), *aff'd*, 763 S.W.2d 407 (Tex. 1989). Karlson may not benefit from deemed findings on the omitted elements because BMC appropriately objected at the charge conference. *See* Tex. R. Civ. P. 279.

BMC goes on to argue that Karlson did not adduce conclusive evidence on the omitted elements. We agree. For example, although elsewhere in the record Karlson adduced evidence suggesting that Silva's driving for BMC before the wreck was at times substandard, Karlson's own commercial-trucking expert testified that: the expert took no issue with BMC's decision to hire Silva, Silva was properly trained to drive the truck at issue, and the expert "had no criticisms of BMC allowing Mr. Silva to operate the vehicle that was involved in this accident." In light of this testimony, Karlson did not adduce conclusive evidence of the omitted elements.

Because, therefore, Karlson failed to secure jury findings or to adduce conclusive evidence on at least one of the elements of negligent entrustment and BMC properly objected to the charge's omission of the elements, Karlson waived any right to recover on negligent

---

[7] Karlson does not argue that any of the other questions or instructions in the charge, whether individually or in aggregate, submit negligent entrustment.

entrustment, and we render judgment that she take nothing by that allegation. *See State Dep't of Highways & Pub. Transp.*, 838 S.W.2d at 241; *Stripling*, 746 S.W.2d at 506.

> *BMC owed no duty to Karlson to train Silva not to speed while driving or to pay attention while driving, including by avoiding cellphone use, because those are driving dangers common to all licensed drivers.*

BMC's next rendition arguments go to Karlson's allegation against it of negligent training. BMC, among other things, puts forward a no-duty argument that "Texas does not impose a duty on an employer to train or instruct employees about driving dangers that are common to all licensed drivers." The existence of a duty is a threshold question of law, and the nonexistence of a duty ends the inquiry into whether negligence liability may be imposed. *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998); *see also Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017) ("The threshold inquiry in a negligence case is duty." (quoting *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990))).

In a recent suit brought by a driver against both an LLC and its agent after the agent injured the plaintiff driver in a car wreck, we upheld a defense summary judgment on direct-negligence claims against the LLC. We concluded, "We find no authority or evidence supporting the imposition of a duty on [the LLC] to train [its agent] to avoid distractions while driving his vehicle." *Cook v. Texas Highway Walls, LLC*, No. 03-22-00736-CV, 2024 WL 2982120, at *5 (Tex. App.—Austin June 14, 2024, pet. denied) (mem. op.). We discussed the summary-judgment record there and concluded that no evidence supported any applicable duty imposed on the LLC, observing:

> There is no evidence that driving the pickup truck . . . was so complex or hazardous that the dangers incident to driving it were not obvious or commonly known and fully understood by [the agent]. . . . There is no evidence . . . that [the LLC] knew or had reason to know that [its agent] was unaware that driving as alleged while

9

conducting business on a cell phone and looking away from traffic was dangerous. [The plaintiff driver]'s evidence such as the drafting of and familiarity with [the LLC]'s handbook and the absence of post-accident investigation are no evidence that [the agent]'s duties at [the LLC] prompted a duty to enact and enforce safety rules about attentively driving a pickup truck.

*Id.* In a similar vein, although in a suit brought by the driving employee against his employer, our sister court concluded that "an employer has no duty to adopt rules or to warn or instruct an employee, who is an experienced driver, with regard to dangers that are ordinarily incident to driving a vehicle and require no special skills or knowledge other than that expected of all licensed drivers." *National Convenience Stores Inc. v. Matherne*, 987 S.W.2d 145, 149 (Tex. App.— Houston [14th Dist.] 1999, no pet.). The Supreme Court of Texas has cited that conclusion with approval, notably, in a suit brought against an employer entity by parties alleging injuries sustained in a car wreck caused by the entity's employee's driving while fatigued because of his work duties. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 403–04, 413 (Tex. 2009). The high Court, in refusing to impose a duty on the employer defendant, stated, "[W]e do not impose a duty to train employees regarding the commonly-known dangers of driving while fatigued," and cited as support the above-quoted material from *National Convenience Stores*. *See Nabors Drilling*, 288 S.W.3d at 413.[8]

---

[8] The statements that we have cited from *Cook*, *Nabors Drilling*, and *National Convenience Stores* operate like an exception to the more general duty rule for employers, which Karlson cites in her briefing, that they have "a general duty to control [their] employees and to adequately hire, train, and supervise employees to prevent injuries to third parties that are reasonably foreseeable." *See Watkins v. Basurto*, No. 14-10-00299-CV, 2011 WL 1414135, at \*4 (Tex. App.—Houston [14th Dist.] Apr. 14, 2011, no pet.) (mem. op.) (internal citation omitted). Nearby in her briefing, Karlson also relies on a statement of ours concerning negligent hiring. *See Guidry v. National Freight, Inc.*, 944 S.W.2d 807, 810 (Tex. App.—Austin 1997, no writ) (stating that driver's employer "has a duty to take steps to prevent injury to the driving public by determining the competency of a job applicant to drive one of its trucks" and referring to this duty

Here, the evidence at trial proved that Silva caused the wreck by running his BMC truck into the back of Hartsell's car, and Karlson adduced evidence intending to show that Silva did so because of either or both of his speeding[9] and his inattention while driving, thereby failing to keep a proper lookout, including by using a cellphone. The direct-negligence allegations "cannot be separated from the predicate question of [Silva]'s responsibility for the accident." *See Werner Enters.*, 719 S.W.3d at 540. Therefore, as in *Werner Enterprises*, there are no viable theories of liability here alleged against BMC that are independent of Silva's responsibility for Williams's injuries. *See id.* at 540–41. Any liability of BMC's under the direct-negligence allegations thus is derivative of Silva's having caused the wreck, which, Karlson's evidence suggested, was due to either or both of his speeding or his inattention while driving.

Yet, the notions that a driver should not speed and that a driver should pay attention while driving, and thus avoid distractions like cellphone use, are "commonly-known dangers of driving." *See Nabors Drilling*, 288 S.W.3d at 413. They are "dangers that are ordinarily incident to driving a vehicle and require no special skills or knowledge other than that expected of all licensed drivers." *See National Convenience Stores*, 987 S.W.2d at 149. They, therefore, are not the subject of a duty owed by BMC to Karlson in its training of Silva. This conclusion is much the same as the one in *Cook*, where we said, "We find no authority or evidence supporting the

---

as one requiring that employer "*hire* competent drivers" (emphasis added)). We do not address negligent hiring here because Karlson does not challenge the trial court's grant of the directed verdict in BMC's favor on that allegation.

[9] In a different argument concerning the direct-negligence allegations against it, BMC argues that any evidence of Silva's speeding, whether in the past or surrounding the wreck at issue, is irrelevant and insufficient to support a judgment in Karlson's favor under any of the direct-negligence allegations. We need not reach that argument. *See* Tex. R. App. P. 47.1.

11

imposition of a duty on [the LLC] to train [its agent] to avoid distractions while driving his vehicle." 2024 WL 2982120, at *5.

Because, as a matter of law, BMC did not owe the alleged duty to train Silva not to speed while driving or to pay attention while driving, including by avoiding cellphone use, Karlson cannot recover under her allegation of negligent training. We therefore render judgment that she take nothing by that allegation.

*The evidence was legally insufficient to support causation for either negligent supervision or negligence in a lacking safety program and was legally insufficient to support breach for negligent retention.*

BMC's final rendition arguments concern the allegations of negligent supervision, negligent retention, and BMC's negligently lacking an adequate safety policy and program for all its drivers. The evidence to support these allegations overlaps to a great degree—for example, Karlson adduced evidence that BMC personnel did not regularly use driver-behavior telematics information able to be gleaned from sensors installed in BMC trucks to monitor for whether Silva or any other BMC driver exhibited a pattern of harsh braking. That kind of evidence appears to implicate, at least, both the negligent-supervision allegation and the allegation of an inadequate company-wide safety program. To the extent that there is a dividing line between, on the one hand, the negligent-supervision and negligent-retention allegations and, on the other, the safety-program allegation, the line appears to be whether BMC's relevant acts and omissions concerned, respectively, either Silva or any of its other drivers.

At the outset, we reject BMC's threshold argument that no such claims for negligent supervision or negligent retention exist in Texas law. We have recognized species of negligent-supervision and negligent-retention duties. *See, e.g., Fernea v. Merrill Lynch Pierce*

*Fenner & Smith, Inc.*, 559 S.W.3d 537, 547–48 (Tex. App.—Austin 2011, no pet.), *judgm't withdrawn but opinion not withdrawn*, No. 03-09-00565-CV, 2014 WL 5801862 (Tex. App.—Austin Nov. 5, 2014, no pet.) (mem. op.); *Porter v. Nemir*, 900 S.W.2d 376, 384–87 (Tex. App.—Austin 1995, no writ); *cf. Walgreens v. McKenzie*, 713 S.W.3d 394, 399 (Tex. 2025) ("Although we have not ruled definitively on the existence, elements, or scope of [a negligent hiring, training, and supervision] claim, we have recognized that any such claim would require proof of the employer's negligence in hiring, training, and supervising the employee as well as the employee's subsequent negligent act or omission, both of which must proximately cause the injury.").

Otherwise, BMC argues that the evidence was legally insufficient to support findings that it breached any negligent-supervision or negligent-retention duty or that any such breach was the proximate cause of Williams's injuries. It also argues that the evidence was legally insufficient to support a finding that any breach along the lines of the deficient-safety-program allegation was the proximate cause of Williams's injuries. *See Rayner v. Claxton*, 659 S.W.3d 223, 247 (Tex. App.—El Paso 2022, no pet.) ("Where the damages alleged by the injured party cannot be causally connected to the actions of the other—even if the other owes the injured party a duty of care and breaches it—negligence has not occurred." (citing *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 551–52 (Tex. 2005))).

To challenge the legal sufficiency of the evidence to support a finding on which an adverse party bore the burden of proof, the appellant must show that the record contains no evidence to support the finding. *CIM Mgmt. Grp. v. Burnett*, No. 03-21-00229-CV, 2022 WL 3567782, at *2 (Tex. App.—Austin Aug. 19, 2022, no pet.) (mem. op.). In conducting our review, we credit evidence that supports the finding if reasonable jurors could have credited it and disregard contrary evidence unless reasonable jurors could not have disregarded it. *Kroger Tex.*

*Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006).  We consider the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Goldstein v. Mortenson*, 113 S.W.3d 769, 775 (Tex. App.—Austin 2003, no pet.).  The evidence is legally insufficient to support a finding when there is a complete absence of evidence of a vital fact, the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more than a scintilla, or the evidence conclusively establishes the opposite of a vital fact.  *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407 (Tex. 2016).

As to causation, Karlson adduced evidence in the form of its commercial-trucking expert's testimony to seek to show that BMC's allegedly lacking supervision of Silva's driving habits and allegedly lacking safety-related program for all its drivers each was a proximate cause of Williams's injuries.  The theory was that Silva would not have caused the wreck had he been better supervised or had all BMC drivers been better trained in safety.  For direct-negligence allegations like Karlson's negligent-supervision and inadequate-safety-program allegations, *both* the employer's negligent act or omission *and* its driver employee's negligent act or omission must be proven to be a proximate cause of the injury alleged.  *See Werner Enters.*, 719 S.W.3d at 540; *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 842–43 (Tex. 2018).  When expert testimony is offered to prove causation in circumstances like these, the expert's testimony, to be reliable, "must be based on a probability standard, rather than on mere possibility."  *See Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015); *accord Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 247 (Tex. 2008) ("'Perhaps' and 'possibly' indicate conjecture, speculation or mere possibility rather than qualified opinions based on reasonable medical probability."); *General Motors Corp. v. Iracheta*, 161 S.W.3d 462, 469 & n.28, 471–72

14

(Tex. 2005) (expert's testimony of mere "possibility"—using that word—of fuel hose's failure was legally insufficient).

Yet Karlson's commercial-trucking expert offered testimony only that negligent supervision and an inadequate safety program were *possible* causes of Williams's injuries:

> Q. Yeah. No matter how much monitoring you could do, you couldn't have prevented that accident by doing more monitoring of Mr. Silva. Do you agree with that, that you couldn't have prevented this accident with more monitoring?
>
> A. I think more monitoring would have gone a long way towards preventing this. Would it absolutely have prevented it? I can't say.
>
> Q. But if someone had brought Mr. Silva in and had said, listen, we've got all of these events; we've got all of these speeding events; we've got all of this data showing the harsh braking events; what's going on; this is unacceptable; we can't have this; we're going to give you a warning, that might have had an impact, right?
>
> A. It could have, yes.
>
> . . . .
>
> Q. . . . You can answer. Could that have made a difference?
>
> A. I think it may have.
>
> Q. And then if the conduct continued after a warning and there was a reprimand, that could have made a difference, too, right?
>
> . . . .
>
> A. Same answer. It may have.

Only regarding *terminating* Silva—"[I]f the conduct continued beyond that and Mr. Silva had been terminated and removed from being behind the wheel of a BMC truck"—did the expert respond

15

that the wreck "would have" been prevented.[10]  Because Karlson's proximate-cause evidence for the allegations of negligent supervision and negligence by lacking an adequate safety policy and program for all drivers was expert testimony that served to prove only a possibility of causation and not its probability, the evidence was legally insufficient to support the causation element of these allegations.  We thus render judgment that Karlson take nothing by these two allegations.

Last is negligent retention, for which BMC argues that the evidence was legally insufficient to support the breach element.  For direct-negligence claims like negligent retention of a driver employee, the relevant level of employee skill to which the employer's obligations attach is whether the employee is a competent or incompetent driver.  *See, e.g.*, *Rayner*, 659 S.W.3d at 248–51 (stating that for claims of negligent hiring, training, and supervising, employer's duties involve whether employee was "incompetent" and concluding in car-wreck suit that, "[f]or these reasons, as they pertain to [employee]'s purported incompetence to safely operate the vehicle and [employer]'s knowledge of the alleged incompetence, we find there is no more than a mere scintilla of evidence [employer] breached its duties of care under negligent entrustment or negligent hiring, training, and supervision theories"); *Guidry v. National Freight, Inc.*, 944 S.W.2d

---

[10]  The question and answer that our dissenting colleague relies on is not to the contrary. In that second exchange, the expert's answer still depended on terminating Silva:

> Q. Mr. Respass, if they had noticed that he had been speeding and engaging in harsh braking events in the months preceding the accident and had taken corrective action with him and then terminated him if he was not following through on the corrective action, that would have prevented this accident, wouldn't it?
>
> A. Yes.

In this second exchange, as in the first that we identified, only when asked about a hypothetical in which BMC terminated Silva did the expert respond that the wreck would have been prevented.

807, 810–12 (Tex. App.—Austin 1997, no writ) (reasoning that although employer owed duties related to "hiring or retaining an incompetent employee"—"a duty to take steps to prevent injury to the driving public by determining the competency of a job applicant to drive one of its trucks"—employer did not owe further duty to protect member of public from driver's acts of sexual assault); *Houser v. Smith*, 968 S.W.2d 542, 544–45 (Tex. App.—Austin 1998, no pet.) (stating that shop employee's acts of sexual assault and resulting harm to appellant "were not foreseeable" despite employee's past convictions for forgery "and therefore [employer] did not owe appellant a legal duty beyond the duty to provide a competent transmission mechanic to [employer's] customers").

Here, the evidence was conclusive that Silva was a competent driver of BMC's trucks. It was undisputed in the evidence that he passed the necessary testing to achieve his commercial driver's license and was licensed, and Karlson's commercial-trucking expert offered testimony supporting findings that BMC's decision to hire Silva, his training by BMC to drive the truck at issue, and BMC's decision to allow Silva to operate the truck were all within the applicable standard of care. Even though Karlson otherwise offered evidence tending to show that Silva had sped many times while driving, that he had caused harsh-braking incidents, and that he was using a cellphone at the time of the wreck at issue, those matters do not show Silva to have been incompetent to drive the truck at issue. *See, e.g.*, *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007) (per curiam) (holding that no evidence supported finding that driver was incompetent despite evidence of past citation for causing a rear-end collision while driving different truck and past citation for speeding while driving employer defendant's truck); *Freyer v. Lyft, Inc.*, 639 S.W.3d 772, 785–89 (Tex. App.—Dallas 2021, no pet.) (holding that no evidence supported finding that driver was incompetent despite evidence of driver's past citations for speeding and even one for a past collision and collecting cases in support). Our conclusion

aligns with that of our sister court in *Rayner*. Here, as there, the driver had ample experience as a commercial truck driver, a clean driving record, and a solid understanding of the rules of the road. *See Rayner*, 659 S.W.3d at 250. Here, as there, there is legally insufficient evidence that the employer knew or should have known that the driver was incompetent or otherwise unfit to operate the truck; instead, the evidence showed that Silva knew better than to speed or to drive inattentively, whether by using a cellphone while driving or otherwise. *See id.* Therefore, Karlson's evidence on the breach element of her negligent-retention allegation is legally insufficient, so we render judgment that she take nothing by that allegation. We sustain the relevant portions of BMC's first appellate issue, and we need not reach the portions of the issue that seek remand for a new trial on the direct-negligence allegations against BMC.

### *Karlson must take nothing on her request for exemplary damages against BMC because neither predicate for holding BMC liable in exemplary damages is viable any longer.*

BMC in its second appellate issue attacks the portion of the judgment holding it liable for exemplary damages.[11] Karlson sought exemplary damages from both BMC and Silva and sought to impose that liability by asking the jury in Question No. 4 about each defendant's alleged gross negligence. In response to that question, the jury answered "Yes" to whether "by clear and convincing evidence . . . the harm of Joy[ce] Williams resulted from gross negligence attributable to" BMC, but the jury failed to answer "Yes" as to Silva. Karlson on appeal does not challenge the lack of any judgment against Silva for exemplary damages and does not challenge the jury's having left the gross-negligence question blank as to Silva.

---

[11] As with the first appellate issue, Silva joins in this second appellate issue, but because it addresses only BMC's liability, we discuss it only in terms of BMC.

Karlson sought to hold BMC liable in exemplary damages on either of two predicate bases—either BMC's own direct negligence and gross negligence or BMC's responsibility for Silva's gross negligence. *See, e.g.*, *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921–22 (Tex. 1998) (discussing varying methods for holding entity liable in exemplary damages); *Rayner*, 659 S.W.3d at 257–58 (same). Because we are rendering judgment that Karlson take nothing on her direct-negligence allegations against BMC, she lacks any direct-negligence basis for holding BMC liable in exemplary damages for its alleged gross negligence. *See Rayner*, 659 S.W.3d at 258 ("Because there is insufficient evidence to link EBL's independent actions to causing the incident, we likewise find the evidence is insufficient to support finding the same allegations constitute grossly negligent conduct, including the allegations of negligent hiring. '[I]t is well established that a finding of ordinary negligence is prerequisite to a finding of gross negligence.'" (internal citation omitted) (quoting *Nowzaradan v. Ryans*, 347 S.W.3d 734, 739 (Tex. App.—Houston [14th Dist.] 2011, no pet.))).

For BMC to be liable in exemplary damages for gross negligence for Silva's acts or omissions, his acts or omissions must have been grossly negligent. *See Mobil Oil*, 968 S.W.2d at 921–22; *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 390–94 (Tex. 1997); *see also Qwest Int'l Commc'ns, Inc. v. AT & T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005) (per curiam) (principle of requiring defendant's agent's or vice principal's acts or omissions to have risen to certain level is the same when the standard for recovery of exemplary damages is malice rather than gross negligence—agent's or vice principal's acts or omissions need have been malicious). The jury here did not find that Silva was grossly negligent, Karlson has not challenged that response from the jury, and Karlson in neither the trial court nor our Court has contended that she adduced conclusive evidence that Silva was grossly negligent. Indeed, Karlson moved for judgment on the

19

jury's verdict, without reservation. *See Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 321–22 (Tex. 1984). BMC has argued these matters in its opening brief on appeal, stating:

> [T]he Court should affirm the judgment as to the jury's failure to find Silva grossly negligent. In moving for judgment on the jury verdict, Karlson did not ask the trial court to disregard the jury's failure to find gross negligence against Silva but instead moved for judgment on the entire verdict. Thus, Karlson has embraced the jury's verdict, including its failure to find Silva grossly negligent.

(Internal citations omitted; citing *id.* at 321–22.) Karlson has not responded on this topic in her appellee's brief. Therefore, BMC cannot be held liable in exemplary damages for gross negligence committed by Silva.

Because Karlson thus lacks any predicate for holding BMC liable in exemplary damages, we sustain BMC's second issue and reverse the portion of the trial court's judgment awarding exemplary damages. When plaintiffs fail to carry their burden on all elements of a claim for relief, the appropriate judgment to render is a judgment that they take nothing on the claim. *See* Tex. R. App. P. 43.3 (default rule when reversing trial court's judgment is that court of appeals "must render the judgment that the trial court should have rendered"); *Hunt v. Heaton*, 643 S.W.2d 677, 679 (Tex. 1982) (stating that "the correct judgment" to render when plaintiff's claim failed on the merits was "that he take nothing"). We thus render judgment that Karlson take nothing on her request for exemplary damages against BMC. Because of this disposition on BMC's second appellate issue, we need not reach its fifth, which also concerns the award of exemplary damages. *See* Tex. R. App. P. 47.1.

***BMC and Silva are not entitled to a judgment that Karlson take nothing for mental anguish.***

BMC and Silva in their remaining appellate issues, their third and fourth, offer numerous discrete reasons for why the judgment should be reversed and a new trial ordered. Also,

20

still another of their discrete arguments under these remaining appellate issues seeks a rendition of judgment, so we address that argument first. *See Bradleys' Elec.*, 995 S.W.2d at 677. Karlson's remaining claims in the suit given our analysis to this point are her direct-negligence claims against Silva, for which she sought damages for physical pain and mental anguish; her request that BMC be held liable for Silva's negligent conduct, which BMC accepts as a matter of *respondeat superior* liability; and her requests for costs and for pre- and postjudgment interest.

BMC and Silva argue for a rendition of judgment on the request for mental-anguish damages because the evidence was legally insufficient to support the existence of those damages, as distinct from the amounts of those damages. Their argument for rendition of judgment is that no evidence showed the actual mental anguish that Williams suffered, as opposed to the hypothetical mental anguish that she may have suffered.[12]

The evidence is legally sufficient to support a particular finding when the evidence would enable reasonable and fair-minded people to make the finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005); *see also Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 311–12, 330 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (same test applies to legal-sufficiency challenge to finding of mental-anguish damages). "[L]egal-sufficiency review

---

[12] Separately, BMC and Silva argue that the evidence was insufficient to support the amounts of mental-anguish and physical-pain damages awarded, but those arguments here would, if meritorious, result merely in remand for a new trial. *See Saenz v. Fidelity Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) ("Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded."); *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 882 (Tex. 2010) (when sufficient evidence exists to support the existence of damages but not the amount awarded, proper appellate disposition is to reverse and remand), *cited in Gregory v. Chohan*, 670 S.W.3d 546, 564 (Tex. 2023) (plurality op.). We do not consider those arguments at this moment because we are considering instead BMC and Silva's discrete rendition argument about the sufficiency of the evidence to show the *existence* here of compensable mental anguish.

in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller*, 168 S.W.3d at 827.

For mental anguish, it has long been "settled in this state that mental suffering is an element of actual damages . . . [w]here serious bodily injury is inflicted, involving fractures, dislocations, etc., and results in protracted disability and confinement to bed"—"we know that some degree of physical and mental suffering is the necessary result" of such an injury. *See Brown v. Sullivan*, 10 S.W. 288, 290 (Tex. 1888). Thus, "some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish." *See Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 445 (Tex. 1995), and citing *Brown*, 10 S.W. at 290). Even this rule aside, "mental anguish awards will pass a legal sufficiency review if evidence is presented describing 'the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine.'" *Id.* (quoting *Parkway*, 901 S.W.2d at 444).

The evidence was legally sufficient to show a substantial disruption to Williams's daily routine and sufficiently described the nature, duration, and severity of her mental anguish. *See id.* The evidence showed that Williams suffered multiple displaced rib fractures because of the wreck, with the result that whenever that area of her body would move, as with a breath, a cough, or a laugh, there would be disabling, stabbing-like pain. Evidence showed that every breath for the rest of Williams's life involved pain. Evidence also showed that the difficulties in breathing and in oxygenating her blood caused by these effects from the wreck led to infection and to, as Karlson's medical expert testified, a condition in which "the lung itself starts to kind of close down" and to what he called "air hunger." The expert added that these conditions cause for patients a "sense of impending doom," a feeling like suffocation, anxiety and panic, fear and terror, and

22

distress, leading the patient to focus at all times solely on breathing. The expert testified that Williams therefore suffered from a condition that when suffered by other patients becomes "terrible until the point they lose consciousness because they can't breathe anymore." She also, the expert testified, suffered from "deconditioning"—the eroding of her ability to carry out day-to-day tasks like walking just a few feet or transferring from chair to bed, which would have caused Williams to experience a concomitant level of frustration. The expert reached his opinions, he testified, based on a review of Williams's medical records, and many of his opinions were corroborated by Karlson's testimony. She testified, based on in-person interaction with Williams in the latter's final days, that Williams was tearful; suffered pain when trying to breathe deeply or to laugh that would cause her to grab herself; and was subjected to "[l]abored, raspy, and gurgling" attempts at breathing.

Given this evidence, we conclude that the evidence was legally sufficient to support a finding about the existence of mental-anguish damages—reasonable and fair-minded people could conclude that Williams before her death suffered a substantial disruption to her daily routine of such nature, duration, and severity as to support the need to award damages. We overrule this portion of BMC and Silva's remaining issues.

***We must remand for a new trial because the trial court imposed death-penalty-like spoliation remedies without first expressly considering lesser remedies or finding that this case is the appropriate "exceptional case."***

Among their remand arguments, BMC and Silva argue that the trial court abused its discretion in its selection of remedies for purported spoliation conduct. They argue that the trial court's both (a) instructing the jury on spoliation and (b) admitting evidence before the jury of BMC and Silva's purported spoliation conduct was improperly excessive.

23

By way of background, about four months before the trial commenced, Karlson moved for a spoliation instruction to be included in the jury charge. She argued that BMC or Silva, as the case may be, spoliated evidence in that they, with the requisite intent, failed to preserve and produce (a) requested telematics data from Silva's truck from the date of the wreck and from certain prior dates, (b) both the BMC company cellphone and Silva's personal cellphone, and (c) Silva's driver logs for the six months before the wreck. The court held an oral, evidentiary hearing on the spoliation-instruction motion and afterward granted it.[13] During trial, Karlson's examinations of several witnesses explored BMC's or Silva's failures to preserve certain data. For example, Karlson questioned her commercial-trucking expert about BMC's failure to retain

---

[13] BMC and Silva at the hearing argued that a spoliation instruction was an improper remedy to impose:

There is some discussion regarding remedies. I think we can all agree that a spoliation is essentially—and it's being characterized by a case called *Petroleum Solutions v. Head*, Texas Supreme Court, 2014—that it is tantamount to death penalty sanction because it instructs the jury that these people have done something wrong. And in this case, there's just not evidence of it. It would not be proportional to the alleged loss of data or the failure to produce anything.

Your Honor, we've produced what's relevant. We've given them the cell phones to download. We gave them—they have the AT&T records of the data usage, the phone usage, the text messaging usage. And we've given them the Telogis data for the relevant period of time, i.e., the date of loss, plus 30 days beforehand.

The purpose of the sanction must be to impose an appropriate remedy so that the parties are restored to a rough approximation of what their positions would have been were the evidence available.

And, Your Honor, there's no sanction that puts them where they should have been because they're already there. There's no sanction that is appropriate because they have the data that goes to proving their claims against Noe Silva and against BMC. Therefore, any type of spoliation instruction, in our view and our argument, would not be proper.

Silva's driver logs going far back enough in time. She questioned her cellphone-networks expert about the failure to preserve cellphone location data for the date of the wreck. And she questioned her accident-reconstruction expert about missing telematics data regarding Silva's truck. At trial, BMC and Silva objected to admitting before the jury any evidence concerning their purported spoliation conduct and objected to the submission of any spoliation instruction to the jury.

We review spoliation-related rulings, including the trial court's selection of a spoliation remedy, for an abuse of discretion. *See Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 489 (Tex. 2014). Even if a litigant is found to have spoliated evidence, the selection of the appropriate remedy for spoliating conduct must fall within certain bounds. *See id.*; *Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 17, 21–27 (Tex. 2014). As with other discovery sanctions, available spoliation remedies occupy a range of severity, culminating in those remedies that are akin to "death-penalty sanctions." *See Petroleum Sols.*, 454 S.W.3d at 489; *In re On Track Experience, LLC*, No. 03-21-00304-CV, 2021 WL 4876949, at *2–3 (Tex. App.—Austin Oct. 20, 2021, orig. proceeding) (mem. op.). Death-penalty-like sanctions for spoliation include striking a party's claims or defenses; ordering the exclusion of the only evidence a party has to support one of its claims or affirmative defenses; and, as relevant here, an instruction to the jury on spoliation. *See Petroleum Sols.*, 454 S.W.3d at 489; *Brookshire Bros.*, 438 S.W.3d at 23; *On Track Experience*, 2021 WL 4876949, at *2–3.

Before a trial court may impose the death-penalty-like spoliation sanction of an instruction to the jury, the trial court must "consider the availability of lesser sanctions and, 'in all

but the most exceptional cases, actually test the lesser sanctions.'"[14] *Petroleum Sols.*, 454 S.W.3d at 489 (quoting *Cire v. Cummings*, 134 S.W.3d 835, 841 (Tex. 2004)); *accord On Track Experience*, 2021 WL 4876949, at *2. "The trial court does not need to test the effectiveness of all available lesser sanctions by actually imposing them before issuing the death penalty but must 'analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed.'" *On Track Experience*, 2021 WL 4876949, at *2 (quoting *Cire*, 134 S.W.3d at 840). Using spoliation jury instructions especially warrants proper curtailing because of how the instruction is likely to skew the fundamental function of the trial:

> The instruction is an important remedy, but its use can affect the fundamental fairness of the trial in ways as troubling as the spoliating conduct itself. As we have recognized, "[b]ecause the instruction itself is given to compensate for the absence of evidence that a party had a duty to preserve, its very purpose is to 'nudge' or 'tilt' the jury" toward a finding adverse to the alleged spoliator. Thus, an unfortunate consequence of submitting a spoliation instruction is that it "often ends litigation" because "it is too difficult a hurdle for the spoliator to overcome." *This "nudging" or "tilting" of the jury is magnified by the presentation of evidence that emphasizes the spoliator's wrongful conduct rather than the merits of the suit.*

*Brookshire Bros.*, 438 S.W.3d at 17 (emphasis added) (internal citations omitted) (first quoting *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 724 (Tex. 2003), then quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219 (S.D.N.Y. 2003)). Thus, the spoliation instruction "is among the harshest sanctions a trial court may utilize" and "should be used cautiously." *Id.* at 23. Importantly then, when "nothing in the record demonstrates that the trial court considered the availability of lesser sanctions or otherwise made any finding that the present dispute constituted

---

[14] Some of the possible less-than-death-penalty-like sanctions may be gleaned from Rule of Civil Procedure 215.2. *See Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 489 (Tex. 2014); *Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 21 (Tex. 2014).

an 'exceptional case' where lesser sanctions would not promote compliance," a spoliation instruction to the jury is an abuse of discretion. *On Track Experience*, 2021 WL 4876949, at \*3.

That is the state of the record here. In neither the hearing on the motion for the spoliation instruction, nor the motion itself, nor the trial record is there any express consideration by the trial court of any sanction less than the spoliation instruction or any express finding that this case is an exceptional spoliation case.[15] And not only did the trial court impose the death-penalty-like sanction of a spoliation instruction, but it also admitted before the jury evidence of the purported spoliation conduct. *See Brookshire Bros.*, 438 S.W.3d at 26–27 ("Our holding that the trial court, not the jury, bears responsibility for making the required spoliation findings and imposing a remedy affects the propriety of admitting evidence regarding spoliation at trial. . . . [T]he tendency of such evidence to skew the focus of the trial from the merits to the conduct of the spoliating party raises a significant risk of both prejudice and confusion of the issues. . . . [T]here is no basis on which to allow the jury to hear evidence that is unrelated to the merits of the case, but serves only to highlight the spoliating party's breach and culpability. While

---

[15] Our dissenting colleague argues that this case is the kind of exceptional case warranting a spoliation instruction to the jury, describing the case as one where "no lesser remedy would have restored Karlson to a rough approximation of the position she would have been in if all evidence were available." But an exceptional-case finding is for the trial court to decide in the first instance, expressly on the record, and when, as here, the trial court has not made the appropriate finding, the trial court abuses its discretion by nevertheless imposing a death-penalty-like sanction. *See In re On Track Experience, LLC*, No. 03-21-00304-CV, 2021 WL 4876949, at \*3 (Tex. App.—Austin Oct. 20, 2021, orig. proceeding) (mem. op.) (granting relief because "nothing in the record demonstrates that the trial court considered the availability of lesser sanctions *or otherwise made any finding* that the present dispute constituted an 'exceptional case' where lesser sanctions would not promote compliance" and citing as support proposition that "a trial court either must impose lesser sanctions first *or must clearly explain on the record* why the case is an exceptional case where it is fully apparent that no lesser sanctions could promote compliance" (emphases added) (quoting *In re First Transit Inc.*, 499 S.W.3d 584, 592 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding [mand. denied]))); *see also Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986) (per curiam) ("[A] court of appeals cannot make original findings of fact.").

such evidence may be central to the trial court's spoliation findings, it has no bearing on the issues to be resolved by the jury.").

We further conclude that the trial court's use of a spoliation instruction and admissions of evidence of spoliation before the jury sufficiently harmed BMC and Silva to warrant a new trial. The instruction and spoliation evidence came amid a trial in which BMC's direct liability and the extent of actual and exemplary damages were closely contested. Karlson raised and re-raised the spoliation topic in her examinations of several witnesses, and both her opening and closing arguments to the jury charged BMC and Silva with having concealed evidence of their wrongdoing, including argument at closing about BMC's "sick," "coverup" culture and argument recapping the spoliation-related portions of the witness examinations. These matters sufficiently resemble the markers of harm discussed in *Brookshire Brothers*, which there merited remand for a new trial. *See* 438 S.W.3d at 29. Indeed, the Court in *Brookshire Brothers* capped off its cautions by saying that "an improper spoliation instruction presents a substantial likelihood of harm" and that "it is 'very difficult to overlook the likely impact' of the spoliation evidence and the instruction." *See id.* (quoting *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 883–84 (Tex. 2014)).

Because the trial court failed expressly to undertake the consideration of lesser sanctions or "exceptional case" status called for by *Petroleum Solutions*, *Brookshire Brothers*, and *On Track Experience* and because the trial court's chosen spoliation remedies caused the requisite harm, we must reverse the rest of the trial court's judgment against BMC and Silva and remand for a new trial. *See Petroleum Sols.*, 454 S.W.3d at 488; *Brookshire Bros.*, 438 S.W.3d at 30. We sustain the relevant portion of BMC and Silva's remaining appellate issues. Because we conclude that the case must be remanded for a new trial, we need not reach the rest of BMC and Silva's remand arguments. *See* Tex. R. App. P. 47.1.

28

## CONCLUSION

We affirm the portions of the judgment that embody the jury's finding that Williams suffered compensable mental anguish and the jury's failure to find any gross negligence by Silva. We reverse the remaining liability and damages portions of the judgment, render judgment that Karlson take nothing by her direct-negligence allegations against BMC, and remand for a new trial consistent with this opinion on Karlson's claims for physical-pain and mental-anguish damages.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed in Part; Reversed and Rendered in Part; Reversed and Remanded in Part
  Concurring and Dissenting Opinion by Justice Triana

Filed:  December 5, 2025

29